Diane S. BOYLE, as Personal Representative of the Estate of John Francis Boyle, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civil Action No. 9:09–939–SB.

United States District Court,
D. South Carolina,
Beaufort Division.

Aug. 7, 2012.

Carl H. Jacobson, Jonathan F. Krell, Uricchio Howe Krell Jacobson Toporek Theos and Keith, Charleston, SC, for Plaintiff.

Lee Ellis Berlinsky, U.S. Attorneys Office, Charleston, SC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DAMAGES

SOL BLATT JR., Senior District Judge.

This matter came before the Court for a non-jury trial on the Plaintiff's action brought against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–80 (hereinafter referred to as "the FTCA").[1] Carl Jacobson and Jonathan Krell represented the Plaintiff at trial, and Lee Berlinsky represented the Defendant. On March 9, 2012, 948 F.Supp.2d 570, 2012 WL 8303337 (D.S.C.2012), the Court issued its findings of fact and conclusions of law as to liability, and the Court incorporates herein those findings of fact and conclusions of law. On March 20, 2012, the Court held a hearing on the issue of damages.

In its March 9th findings of fact and conclusions of law, the Court found that the Plaintiff met her burden of proof to establish the Defendant's liability. Specifically, the Court found it more likely than not that the Beaufort Naval Hospital misfilled John Francis Boyle's (hereinafter referred to as "Mr. Boyle" or "the decedent") 0.5–milligram Prograf[2] prescription in December of 2005, and that instead of dispensing 180 0.5–milligram Prograf capsules, the Beaufort Naval Hospital negligently dispensed 180 5–milligram capsules of Prograf. (Entry 59 at 3, ¶ 11.) The Court also found from what it deemed to be the more credible evidence that Mr. Boyle's hospitalizations on February 2, 2006, February 19, 2006, and March 19, 2006, more likely than not occurred at least in part because Mr. Boyle was taking an improper daily dose of Prograf due to the December 2005 mis-fill. (*Id.* at 4, ¶ 13.) Therefore, the Court found that the Defendant breached the standard of care and that the breach proximately caused Mr. Boyle's Prograf toxicity, thereby contributing to his death. (*Id.* at 8, ¶ 9.)

Despite the foregoing, the Court also found that at some point between the December 2005 mis-fill and his final hospitalization, Mr. Boyle should have recognized that the bottle of 0.5–milligram Prograf capsules actually contained 5–milligram capsules, based on factors such as his familiarity with the medication and the differing characteristics of the dosages, including size, color, and markings. (*Id.* at 9, ¶ 11, 12.) Thus, in addition to finding that the Defendant was negligent, the Court also found that Mr. Boyle was negligent by failing to recognize the mis-fill at some point between December 2005 and his subsequent hospitalizations. (*Id.*, ¶ 13.) Ultimately, the Court attributed twenty-five percent of the fault to Mr. Boyle. (*Id.*)

1. The Plaintiff filed her amended complaint on April 13, 2009, alleging that her husband died of Tacrolimus toxicity and kidney failure due to the negligent, careless, and reckless filling and dispensing of her husband's medication by employees at the Beaufort Naval Hospital Pharmacy. (Entry 1 at 2.)

2. Following his transplant, Mr. Boyle was prescribed Tacrolimus (available under the brand name "Prograf"), which is an immunosuppressant medication that helps prevent a person's immune system from rejecting a transplanted organ. Prograf is available for oral administration as capsules in the following dosages: 0.5 milligram, 1 milligram, or 5 milligrams. The colors and sizes of 0.5–milligram capsules, 1–milligram capsules, and 5–milligram capsules are different, and they are distinguishable by sight. In addition, each capsule contains a marking identifying the dosage. Prograf is considered a narrow therapeutic index medication, which means there is a small margin of error in dosing and significant toxicity can result from a minor overdose.

### FINDINGS OF FACT[3]

1. Mr. Boyle was born on July 3, 1934, and he was seventy-one years old at the time of his death on April 28, 2006.

2. In the mid-nineties, Mr. Boyle began suffering from renal disease secondary to autosomal dominant polycystic kidney disease.

3. In November of 2000, Mr. Boyle received a kidney transplant, and his medical records indicate that he was mostly stable from the time of his transplant until February of 2006.

4. Mr. Boyle graduated from college in 1956 and went to work in the New York City Police Department, where he worked for thirty years, in addition, Mr. Boyle was in the New York National Guard and Army Reserve for thirty years.

5. Diane S. Boyle ("Diane") was born on December 17, 1935, and she met Mr. Boyle when she was eighteen or nineteen years old. They married when she was twenty-three years old, and together they had two children, Julie Boyle Mecca ("Julie") and John C. Boyle ("John").

6. At the time of Mr. Boyle's death, Diane and Mr. Boyle had been married for forty-seven years, and from the evidence presented, it appears that they had a very loving and happy relationship. Diane testified that Mr. Boyle was a great husband, the love of her life, her best friend, and her spiritual partner.

7. When Mr. Boyle was twenty-seven years old, Diane gave birth to a daughter, Julie. According to Julie, it was a "great family." Julie lived under the same roof with her parents until she got married at age twenty-six. In addition, her father's line of work influenced her to go work for the Department of Probation and for the District Attorney's Office. Julie particu-larly enjoyed it when her father spent time with her and her three children. In all, it appears from the evidence presented that Julie had a close, loving relationship with her father.

8. When Mr. Boyle was thirty years old, Diane gave birth to a son, John. In addition to being his father's namesake, John followed his father's footsteps into the police academy and the national guard. From all accounts John and his father had a close relationship; they participated in joint athletic activities and enjoyed family vacations and outings. John lived at home until he entered the police academy at age twenty-one, and even after he moved out of the house, he continued to see his father at least twice a week. John had plans to eventually move to Hilton Head to spend more time with his parents. As with Julie, it appears from the evidence that John had a close, loving relationship with his father.

9. Mr. Boyle and his family lived in one home in New York until 1995 when he and his wife moved to Hilton Head, South Carolina.

10. Mr. Boyle was an active member of both his family and his community. He was involved with his church and he served as the financial secretary and chief recruiter for the Knights of Columbus.

11. At the time of his death, Mr. Boyle was receiving police retirement income from his employment with the New York City Police Department, military retirement income, and Social Security benefits. In 2005, the last full year before his death, Mr. Boyle received approximately $44,050.00 in police retirement income, approximately $16,096.00 in military retirement income, and $17,054.00 in Social Security benefits.

---

**3.** To the extent that the Court has made "findings of fact" that would be better expressed as "conclusions of law," and vice versa, each category is expressly incorporated into the other.

## CONCLUSIONS OF LAW

1. This case involves claims based on the South Carolina statutes for a "survival right of action," S.C. Code Ann. § 15–5–90, and for "wrongful act causing death," S.C. Code Ann. § 15–51–10.

2. Section 15–5–90 of the South Carolina Code (sometimes referred to as the "survival statute") provides in pertinent part: "Causes of action for and in respect to ... any and all injuries to the person or to personal property shall survive both to and against the personal or real representative, as the case may be, of a deceased person .... any law or rule to the contrary not withstanding." S.C. Code Ann. § 15–5–90.

3. Thus, the "survival statute provides that a cause of action for injuries to a person shall survive the person's death, with damages recoverable by the legal representative of the deceased." *Smalls v. South Carolina Dept. of Educ.*, 339 S.C. 208, 216, 528 S.E.2d 682, 686 (Ct.App. 2000).

4. In a survival action, the legal representative of the deceased may recover damages for the deceased's conscious pain and suffering and medical expenses. *See Baker v. Sanders*, 301 S.C. 170, 391 S.E.2d 229 (1990) (finding that the South Carolina Tort Claims Act does not preclude a survival action for conscious pain and suffering and medical expenses when an injured person later dies as a result of the tortious conduct).

5. In addition, pursuant to section 15–5–100 of the South Carolina Code, funeral expenses are recoverable in a survival action. S.C. Code Ann. § 15–5–100.

6. Next, section 15–51–10 (sometimes referred to as the "wrongful death statute") provides;

Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as made the killing in law a felony....

S.C. Code Ann. § 15–51–10.

7. Section 15–51–20 outlines the beneficiaries of a wrongful death action, stating:

Every such action shall be for the benefit of the wife or husband and child or children of the person whose death shall have been so caused, and, if there be no such wife, husband, child, or children, then for the benefit of the parent or parents, and if there be none such, then for the benefit of the heirs of the person whose death shall have been so caused. Every such action shall be brought by or in the name of the executor or administrator of such person.

*Id.* at § 15–51–20.

8. In a wrongful death action in South Carolina, the damages recoverable by the statutory beneficiaries of the decedent include (1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the intestate's society. *Knoke v. South Carolina Dept. of Parks, Recreation & Tourism*, 324 S.C. 136, 141, 478 S.E.2d 256, 258 (1996). "In a wrongful death case, the question of damages is not directed toward the value of the human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death." *Self v. Goodrich*, 300 S.C. 349, 351, 387 S.E.2d 713, 714 (Ct.App.1989).

9. This case also involves application of the South Carolina Noneconomic Damage

Awards Act of 2005. Specifically, section 15–32–220 provides:

(A) In an action on a medical malpractice claim when final judgment is rendered against a single health care provider, the limit of civil liability for noneconomic damages of the health care provider **is limited to an amount not to exceed three hundred fifty thousand dollars as for each claimant, regardless of the number of separate causes of action on which the claim is based,** except as provided in subsection (E).[4]

S.C. Code Ann. § 15–32–220(A) (emphasis added).

■■■ 10. Here, the parties dispute how the Court should construe the term "claimant" in section 15–32–220(A). Specifically, the Plaintiff urges the Court to find four claimants in this case: (1) the estate of Mr. Boyle in the survival action; (2) Diane Boyie in the wrongful death action; (3) Julie Boyle Mecca in the wrongful death action; and (4) John C. Boyle in the wrongful death action. In contrast, the government argues that there is only one claimant in this case: the patient, Mr. Boyle.

11. Section 15–32–210(2) of the South Carolina Code (titled "Definitions") states that " '[c]laimant' means the person suffering personal injury." *Id.* at § 15–32–210(2) (emphasis added).

12. Subsection (11) then defines "[p]ersonal injury" as the following: "injuries to the person **including, but not limited to, bodily injuries, mental distress or suffering, loss of wages, loss of service, loss of consortium, wrongful death, survival, and other noneconomic damages and ac-**

**tual economic damages."** *Id.* at § 15–32–210(11) (emphasis added).

13. "Personal injury action" is defined as "an action for personal injury, including a wrongful death action pursuant to Sections 15–51–10 through 15–51–60 and a survival action pursuant to Section 15–5–90." *Id.* at § 15–32–210(12).

14. Subsection (9) provides that "[n]oneconomic damages" means "nonpecuniary damages arising from pain, suffering, inconvenience, physical impairment, disfigurement, mental anguish, emotional distress, loss of society and companionship, loss of consortium, injury to reputation, humiliation, other nonpecuniary damages, and any other theory of damages including, but not limited to, fear of loss, illness, or injury." *Id.* at § 15–32–210(9).

15. Although there is little guidance on how to construe the term "claimant" other than the statutory language itself, the Plaintiff provided the Court with a copy of an order issued on March 25, 2009, by South Carolina Circuit Court Judge John C. Hayes, III.[5] In his order, Judge Hayes discusses the Noneconomic Damages Awards Act of 2005 and states:

The phrase "for each claimant" makes clear that the caps apply separately to each claimant. Therefore, if the caps apply separately for each claimant, it becomes necessary for a jury to award damages separately to each claimant.

In addition, it is conceivable that a jury could determine that one claimant deserves a larger damage award than another claimant. For example, in a case where a mother and father are suing for the wrongful death of their child, a jury

---

4. Subsection (F) includes a built-in inflation valve tied to the Consumer Price Index. *See* S.C. Code Ann. § 15–32–220(F). Taking into consideration this built-in inflation valve, the current maximum amount recoverable is $415,055.00.

5. Because it is not entirely clear from the docket whether a copy of this order was formally filed with one of the Plaintiff's briefs or memoranda, the Court attaches a copy of the order hereto as Exhibit A.

could award more damages to the mother than the father because the mother was more directly involved in the caring and support of each child. *Wilson v. Amisub of South Carolina, Inc., et al.,* Civil Action No. 06–CP–46–2891, Order dated March 25, 2009, Exhibit A at 4.

16. Ultimately, after a great deal of consideration, the Court agrees with the Plaintiff that this case involves four claimants rather than just one. Stated simply, the Court believes that the statutory language, including the definitions set forth above, requires such a finding. First, the statute makes clear that the number of causes of action is irrelevant. *See* S.C. Code Ann. § 15–32–220(A). Moreover, the statute caps damages for "each claimant" and not "the claimant." *Id.* Although claimant means "*the* person suffering personal injury," *id.* at § 15–32–210(2) (emphasis added), the definition of personal injury makes clear that not only does Mr. Boyle (or more accurately, his estate) qualify as a claimant pursuant to the survival statute, but also, Diane, Julie, and John each qualify as claimants pursuant to the wrongful death statute, as they each suffered personal injury, which is defined to include (and not limited to) "mental distress or suffering, loss of wages, loss of service, loss of consortium, wrongful death, survival, and other noneconomic damages and actual economic damages." *Id.* at § 15–32–210(11).

17. Having resolved the foregoing issue, the Court next determines the decedent's life expectancy. According to South Carolina Code Section 19–1–500, Mr. Boyle's life expectancy was an additional twelve years (12.01 years, in fact, which would have carried Mr. Boyle to age 83.82).

18. However, Dr. Michael P. Mayes, who personally treated Mr. Boyle from September 23, 2004, until January of 2006, testified that based on his medical history Mr. Boyle likely would have lived another eight to ten years if not for the apparent Prograf overdose.

19. In contrast, the government's expert witness in the field of nephrology and transplant medicine, Dr. Anil Chandraker, who did not treat Mr. Boyle, testified that Mr. Boyle likely would have lived another five years.

20. After thoroughly considering the evidence and testimony presented, the Court finds itself more persuaded by Dr. Mayes' testimony than by Dr. Chandraker's, particularly in light of the fact that Dr. Mayes actually treated Mr. Boyle over a period of time. However, the Court notes that Dr. Chandraker presented compelling testimony regarding life expectancy studies of individuals with kidney transplants, and based in part on that information, the Court accepts the lower end of Dr. Mayes' suggested life expectancy rather than the middle or higher end. Therefore, the Court finds that Mr. Boyle had a life expectancy of eight years.

### Damages in the Survival Action

21. After consideration, the Court finds that **Diane Boyle, the duly-appointed personal representative of the estate of Mr. Boyle, is entitled to $319,412.17 in economic damages in the survival action,** which consists of the following:

a. $3,952.10 for Mr. Boyle's hospitalization at the Hilton Head Regional Medical Center on February 2, 2006;

b. $37,410.83 for Mr. Boyle's hospitalization at the Hilton Head Regional Medical Center on February 19, 2006;

c. $22,305.40 for Mr. Boyle's hospitalization at the Hilton Head Regional Medical Center on March 19, 2006;

d. $202,131.34 for Mr. Boyle's hospitalization at Emory University Hospital;

e. $49,259.00 for Mr. Boyle's treatment at the Emory Clinic; and

f. $4,353.50 in funeral expenses;

22. The estate of Mr. Boyle is entitled to recover for the non-economic damages suffered by Mr. Boyle between the time of the mis-fill on December 6, 2005, until the date of his death on April 28, 2006, to the extent that those non-economic damages are attributable to the mis-fill.

23. The Plaintiff presented evidence showing that, towards the end of Mr. Boyle's life, he suffered from diarrhea, acute renal failure, respiratory failure, volume overload, difficulty moving, and cellulitis, among other things. At one point, in a matter of three weeks, Mr. Boyle gained twenty-five to thirty pounds due to fluid retention. Mr. Boyle was hospitalized for a total of thirty-nine days between December 6, 2005, and April 28, 2006, and he was intubated and on a respirator for three weeks. Even after being taken off the intubator and put into hospice care, Mr. Boyle was on a morphine drip for twelve days. In all, the Court has no doubt that Mr. Boyle experienced a great deal of pain and suffering, for which the Court believes **the estate of Mr. Boyle is entitled to recover $250,000.00 in noneconomic damages in the survival action.**

### Damages in the Wrongful Death Action

24. Diane Boyle, as a surviving spouse, and Julie and John, as surviving children, are the beneficiaries in the wrongful death action. The Court has carefully considered evidence in the record, including the testimony of the beneficiaries, and it is clear that they suffered a difficult loss.

25. With respect to the economic damages suffered by Diane Boyle, the Plaintiff presented the testimony and expert report of Dr. Oliver G. Wood, Jr., dated February 7, 2011. In this report, Dr. Wood used a life expectancy of nine years (the average of the eight-to-ten-year range testified to by Dr. Mayes) and came up with a total amount of economic loss of $501,148.00.

26. The Court has great respect for Dr. Wood's calculations; however, the Court is not fully convinced by these calculations for various reasons including the following. First, Dr. Wood relied on a life expectancy of nine years whereas this Court has found Mr. Boyle's life expectancy to be eight years. Second, Dr. Wood included a $12,000 variable supplement to Mr. Boyle's police retirement income as a yearly supplement without knowing whether the supplement was tied to market conditions or whether the supplement was to continue every year of Mr. Boyle's retirement. (See Entry 57 at 74–75.) Third, it is not clear whether the surviving spouse benefit that Diane Boyle receives ($11,076 per year as of the time of trial) comes from a collateral or a noncollateral source because the evidence does not indicate with any certainty whether or not Mr. Boyle's military pension was reduced actuarially to provide for the benefit.

### I. The Surviving Spouse's Damages

27. Ultimately, having started by considering Dr. Wood's computation of $501,148.00, and having considered certain factors that negatively affect that computation (such as the Court's finding of a reduced life expectancy as well as the other concerns outlined in paragraph 25), the Court finds, based on all of the evidence presented, that **Diane Boyle is entitled to recover $375,000.00 in economic damages in the wrongful death action.**

28. Next, the Court finds that Diane, who has undoubtedly suffered a great loss, is entitled to **recover $400,000.00 in noneconomic damages in the wrongful death action.**

## II. *The Surviving Children's Damages*

29. Next, the Court finds that Julie and John, the surviving children of Mr. Boyle who also have suffered from the loss of their father, are **each entitled to $200,000.00 in noneconomic damages in the wrongful death action.**

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED** that

(1) Diane Boyle, as the duly-appointed personal representative of the estate of Mr. Boyle, is entitled to $319,412.17 in economic damages and $250,000.00 in noneconomic damages in the survival action, to be reduced by twenty-five percent, which amounts to $239,559.13 in economic damages and $187,500.00 in noneconomic damages, together totaling **$427,059.13.**

(2) Diane Boyle, as the surviving spouse of Mr. Boyle, is entitled to$375,000.00 in economic damages and $400,000.00 in noneconomic damages in the wrongful death action, to be reduced by twenty-five percent, which amounts to $281,250.00 in economic damages and $300,000.00 in noneconomic damages, together totaling **$581,250.00.**

(3) Julie Boyle, as a surviving child of Mr. Boyle, is entitled to $200,000.00 in noneconomic damages in the wrongful death action, to be reduced by twenty-five percent, for a total of **$150,000.00.**

(4) John Boyle, as a surviving child of Mr. Boyle, is entitled to $200,000.00 in noneconomic damages in the wrongful death action, to be reduced by twenty-five percent, for a total of **$150,000.00.**

Altogether the total judgment in this case amounts to **$1,308,309.13.**

IT IS FURTHER ORDERED that the judgment shall bear the current statutory legal rate of interest from the date of the judgment until it is satisfied.

**IT IS SO ORDERED.**

## EXHIBIT A

STATE OF SOUTH CAROLINA

COUNTY OF YORK

Robin R. Wilson and Brice R. Wilson Individually and as Personal Representatives for the Estate of Sierra R. Wilson,

Plaintiffs,

vs.

Amisub of South Carolina, Inc., d/b/a Piedmont Healthcare System and Piedmont Medical Center, and James R. Granger, III, M.D.,

Defendants.

IN THE COURT OF COMMON PLEAS
C.A. No.: 06–CP–46–2891

ORDER

This matter comes before the Court on five post-trial motions made by Defendant Amisub of South Carolina, Inc., d/b/a Pied-

mont Healthcare System and Piedmont Medical Center ("the Hospital"). This medical malpractice case was tried to verdict in front of the undersigned in York, South Carolina, during the February 9, 2009, Term of Common Pleas Court. Plaintiffs were awarded a total verdict in the amount of $4,405,000.00.[1] Plaintiffs were represented by Kenneth Suggs, Esq. and Gerald Jowers, Esq. Defendant Hospital was represented by William Gunn, Esq., and Defendant James R. Granger, III, M.D. ("Dr. Granger") was represented by Ashby Davis, Esq. and Collie Lehn, Esq. A hearing was heard on the motions in Union, South Carolina, by the undersigned on March 16, 2009. Plaintiff was represented by Kenneth Suggs, Esq., the Hospital was represented by William Gunn, Esq., and Ashby Davis, Esq. represented Dr. Granger. For the below reasons, the Court denies the Hospital's motions.

## Motion for New Trial Based on the Thirteenth Juror Doctrine

In *Youmans ex rel. Elmore v. S.C. Dept. of Transp.*, 380 S.C. 263, 272, 670 S.E.2d 1, 5 (Ct.App.2008), the Court of Appeals recently explained the purposes of the thirteenth juror doctrine:

> The thirteenth juror doctrine is a vehicle by which the trial court may grant a new trial absolute when he finds that the evidence does not justify the verdict. This ruling has also been termed granting a new trial upon the facts. The effect is the same as if the jury failed to reach a verdict. The judge as the thirteenth juror "hangs" the jury. (*citing Folkens v. Hunt*, 300 S.C. 251, 254–55, 387 S.E.2d 265, 267 (1990)).

The *Youmans* Court also made clear that "[t]he 'thirteenth juror' doctrine is not used when the trial judge has found the verdict was inadequate or unduly liberal and, therefore, is not a vehicle to grant a new trial *nisi additur*." *Bailey v. Peacock*, 318 S.C. 13, 14–15, 455 S.E.2d 690, 692 (1995). *Youmans* at 273, 670 S.E.2d 1.

This Court finds that the evidence presented at trial justifies the verdict and that the verdict is neither inconsistent nor a reflection of confusion by the jury. The interpretation and reporting of both the fetal monitor strips and the complete blood count (CBC) test formed the basis for Plaintiffs' theory of negligence. Plaintiffs' expert, Dr. Jeffery King, testified that the fetal monitor strips showed recurrent late decelerations, a sign, according to him, indicating placental insufficiency. While Defendants' witnesses and expert witnesses offered a different interpretation of the fetal monitor strips, it was for the jury to decide the weight and credibility to give to the differing testimony.

Similarly, it was for the jury to decide the weight and credibility to give to the testimony regarding the CBC test. Dr. Granger testified that he could not remember whether he had the CBC test results on November 16, 2003, but that this did not impact his treatment of Mrs. Wilson. Moreover, Dr. Granger's expert, Dr. Robert Arnett, testified that obstetricians may rely on the information given to them by nurses—in this case, the results from the fetal monitor and CBC tests—and that to do so is not a deviation from the standard of care. Based on this and other evidence and testimony offered at trial, the jury had enough evidence to reach a verdict against the Hospital but not against Dr. Granger

---

1. The jury found Dr. Granger not liable. The Plaintiffs have moved this Court to declare the statutory cap on noneconomic damages unconstitutional. That motion is not addressed in this Order.

and such a verdict is justified by the evidence and is not inconsistent or illogical.

## Motion for New Trial Based on the Verdict Form

Under Rule 59(a), SCRCP, a "new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the State . . .". The Hospital bases its first motion for new trial on the grounds that the Court erred in providing separate lines on the verdict form for Robin Wilson and Brice Wilson in the wrongful death cause of action. Instead, the Hospital argues the Court should have submitted a form with one line letting the probate court divide any verdict between the co-personal representatives.

Using separate lines on the verdict form complies with the South Carolina wrongful death statute and the statute regarding caps on noneconomic damages.[2] Section 15–51–40 of the wrongful death statute says that "the jury may give damages . . . as they may think proportioned to the injury resulting from the death to the parties *respectively* for whom and for whose benefit such action shall be brought." S.C. Code Ann. § 15–51–40 (Rev. 2005) (emphasis added). That the legislature chose to use the word "respectively" indicates its desire to separate the amount of damages according to each claimant. *See Matter of Decker,* 322 S.C. 215, 219, 471 S.E.2d 462, 463 (1995) ("A statute should be so construed that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous . . . .") (citation omitted).

In addition, the statute dealing with caps on noneconomic damages, section 15–32–220(a), says

> [i]n an action on a medical malpractice claim when final judgment is rendered against a single health care provider, the limit of civil liability for noneconomic damages of the health care provider is limited to an amount not to exceed three hundred fifty thousand dollars *for each claimant,* regardless of the number of separate causes of action on which the claim is based, except as provided in subsection (E).

S.C. Code Ann. § 15–32–220(a) (Supp. 2008) (emphasis added). The phrase "for each claimant" makes clear that the caps apply separately to each claimant. Therefore, if the caps apply separately for each claimant, it becomes necessary for a jury to award damages separately to each claimant.

In addition, it is conceivable that a jury could determine that one claimant deserves a larger damage award than another claimant. For example, in a case where a mother and father are suing for the wrongful death of their child, a jury could decide to award more damages to the mother than the father because the mother was more directly involved in the caring and support of the child. Such a possibility makes separate lines on a verdict form for each claimant appropriate and necessary.

---

**2.** The statute regarding noneconomic damages, section 15–32–220, was enacted by 2005 Act No. 32, which says "this act takes effect July 1,2005, for causes of action arising after July 1, 2005." Therefore, the caps do not apply to the damages awarded in Sierra Wilson's survival action because that action arose on November 18, 2003. Assuming for the moment that they are constitutional, the caps do apply to the wrongful death claim, which arose in February 2008; therefore, this Court must comply with the language in that section.

## Motion for New Trial Based on the Court's Note to the Jury

The Hospital also argues the Court should grant a new trial because the Court erred in its response to a request from the jury to rehear the testimony of Nurse Lisa Reynolds and, instead, wrote a note to the jury answering its question.[3] In support of its argument, the Hospital cites Article V, § 21 of the South Carolina Constitution, which says that "[j]udges shall not charge juries in respect to matters of fact, but shall declare the law."

This Court does not believe its handling of the jury's question regarding Nurse Reynolds' testimony constitutes grounds for a new trial. The Court gave a completely accurate response to the question asked and only responded to the question asked. More importantly, the Court's response did not comment on the facts but, rather, simply stated what Nurse Reynolds had said. It would have been unfair to the Plaintiff to direct the jury to other testimony because such an emphasis from the Court might have been misconstrued by the jury.

Article V, § 21 of the Constitution deals with jury charges not responses to jury questions. If this Court were to apply Article V, § 21 as narrowly as the Hospital seems to want, then a judge would not be allowed to comment on a question from the jury requesting pens and paper because such a comment would not deal with the law. Such a result is neither required nor contemplated under our Constitution.

The undersigned has adopted the philosophy/practice of responding to jury questions with specificity. That is, the jury poses a question, the Court answers *that*

question. For the Court to broaden the jury's inquiry would, in the undersigned's opinion, interject the trial judge into the jury's analysis and deliberations. The Court would in essence be saying "well, you asked this, but don't you think you should consider this other thing also?" The undersigned believes to broaden the answer to a question beyond the question itself places the judge in the jury room as a thirteenth juror.

Finally, this Court's ruling on the jury's note must be considered in light of Rule 61, SCRCP. Rule 61 says that " ... no error or defect in any ruling or order or anything done or omitted by the court ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." Rule 61, SCRCP. Writing a completely accurate response to a jury's question is not inconsistent with substantial justice and did not prejudice the Hospital.

## Motion for New Trial or in the Alternative New Trial *Nisi* (Excessive Verdict)

The Hospital makes its last motion for new trial on the grounds that the total verdict of $4,405,000.00 was excessive and based upon arbitrariness, capriciousness, passion, prejudice, or other considerations not found in the evidence. The Court disagrees.

"A new trial absolute should be granted only if the verdict is so grossly excessive that it shocks the conscience of the court and clearly indicates the amount of the verdict was the result of caprice, passion, prejudice, partiality, corruption, or other improper motive" *Knoke v. S.C. Dept. of*

3. The jury's question was "[m]ay we hear Ms. Reynolds' testimony of what she reported to the doctor about the NST/CST results?" The Court's response was "[w]e have examined the testimony of Ms. Reynolds and she testified that she could not recall what she reported to Dr. Granger."

*Parks, Recreation, and Tourism,* 324 S.C. 136, 141, 478 S.E.2d 256, 258 (1996) (citations omitted). "[T]he circuit court alone has the power to grant a new trial *nisi* when it finds the amount of the verdict to be merely inadequate or excessive. *McCourt by and through McCourt v. Abernathy,* 318 S.C. 301, 308, 457 S.E.2d 603, 607 (1995). "Compelling reasons, however, must be given to justify invading the jury's province in this manner." *Bailey v. Peacock,* 318 S.C. 13, 14, 455 S.E.2d 690, 691 (1995)." *RRR, Inc. v. Toggas,* 378 S.C. 174, 183, 662 S.E.2d 438, 442–43 (Ct.App. 2008).

The verdict in this case does not shock the conscience of the Court, and the verdict is not excessive. The decedent, Sierra Wilson, lived with substantial pain and suffering that supports a verdict in her survival action of $2,405,000.00 for her medical expenses and pain and suffering. Part of her pain and suffering included the seizures she experienced when she was only six hours old; kidney failure; the numerous operations she had; and the fact that she suffered from cerebral palsy. While the Defendants may disagree as to the cause and culpability of these problems, the jury returned a verdict against the Hospital and the Court must analyze the reasonableness and excessiveness of the verdict in light of the jury's determination of negligence.

Similarly, the jury's award of $1,000,000.00 each to Robin and Brice Wilson in their wrongful death action is not excessive and does not shock the conscience of the court. The jury's award was reasonable based on the evidence and testimony presented at trial regarding Robin and Brice's pain and suffering, including the fact that Sierra is the only child that Robin and Brice will be capable of having together since Robin was sterilized when Sierra was born.

**Motion to Alter or Amend the Judgment by Reducing the Verdict**

Pursuant to Rule 59(e), SCRCP, the Hospital moves the court to alter or amend the judgment by reducing the verdict. This issue is affected by the Court's ruling on Plaintiffs' motion regarding the constitutionality of the statutory caps on non-economic damages in medical malpractice causes of action. Based on the Order issued by this Court this date, the Court finds the statutory caps constitutional and reduces the verdict in accordance with § 15–32–220(A)–(F).

The caps require reducing each of the Wilson's award to $350,000.00 and then increasing or decreasing that amount based on the Consumer Price Index formula set forth in § 15–32–220(F). The Chief Economist at the State of South Carolina Board of Economic Advisors has informed the parties that applying subsection (F) increases the caps to $386,650.00. Therefore, Robin Wilson's wrongful death verdict is reduced to $386,650.00 and Brice Wilson's wrongful death verdict is reduced to $386,650.00.

Wherefore, the Hospital's Motion for New Trial Based on the Thirteenth Juror Doctrine is DENIED; the Hospital's Motions for New Trial Based on the Verdict Form and the Court's Note to the Jury are DENIED; the Hospital's Motion for New Trial or in the Alternative New Trial *Nisi* is DENIED; and the Hospital's Motion to Alter or Amend the Judgment by Reducing the Verdict is GRANTED.

IT IS SO ORDERED.

John C. Hayes, III

Presiding Judge

March 29th, 2009
York, South Carolina